IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| STATE OF KANSAS, et al, <br><br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services, et al, <br><br> *Defendants*. | Civil Action No. 1:24-cv-00110 |

## MOTION FOR PRELIMINARY INJUNCTION PENDING APPEAL AND REQUEST FOR EXPEDITED RULING

Consistent with Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1), Plaintiffs move for an injunction pending appeal of the Court's order denying Plaintiffs' motion for preliminary injunction of Defendants' Final Rule. *See* Order, ECF 95. As explained below and in prior briefing, *see* ECF Nos. 30, 46, and 78, Plaintiffs are likely to succeed on the merits, will suffer irreparable harm absent a preliminary injunction, and the balance of equities and public interest are in their favor. They are therefore likely to succeed in their appeal.

An injunction pending appeal is appropriate and necessary to prevent additional irreparable harm to Plaintiffs. In light of the continuing and irreparable harm to the Plaintiffs, Plaintiffs request an expedited ruling before close of business on Tuesday, January 21, 2025, so that Plaintiffs can expeditiously seek relief at the appellate court if necessary.

## BACKGROUND

On May 10, 2024, Defendants issued their Final Rule: "Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting" ("the Final Rule"). *See* 89 Fed. Reg. 40876. The Final Rule imposed a

1

staffing mandate that tripled Congress's standard for RN care, imposed an inflexible staffing mandate without consideration of local needs or conditions,[1] and supported those staffing mandates with a new enhanced facility assessment ("EFA"). *See* 89 Fed. Reg. at 40,876. Plaintiffs—20 states and 18 organizations representing long-term care facilities (LTCs)—challenged the Final Rule on October 8, 2024. ECF 1. On October 22, Plaintiffs moved for a preliminary injunction. ECF 30. The Court heard oral argument on the motion on December 5. On January 16, 2025, the Court issued an order denying the motion for a preliminary injunction. ECF 95

## LEGAL STANDARD

Fed. R. of App. P. 8(a)(1)(c) requires a party seeking an injunction pending appeal to move in the district court first. "In ruling on a request for an injunction pending appeal, the court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction." *Walker v. Lockhart*, 678 F.2d 68, 70 (8th Cir. 1982). So the Court must consider "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other litigant[s]; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Law v. Gast*, 643 F.Supp.3d 914, 917 (S.D. Iowa, 2022) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

## ARGUMENT

Plaintiffs meet the standard for preliminary injunctive relief. As this Court agrees, they have shown the Final Rule will irreparably harm Plaintiffs. Further, Plaintiffs are likely to

---

[1] The Final Rule requires (1) total nurse staffing of at least 3.48 hours per resident day ("HPRD"); (2) a mandate for RN staffing of at least 0.55 HPRD; and (3) nurse aid ("NA") staffing of at least 2.45 HPRD.[1] 89 Fed. Reg. at 40877.

succeed on the merits, and the balance of harms and the public interest weigh substantially in their favor.

## I. Plaintiffs will suffer irreparable harm if the Final Rule is not enjoined

### a. The EFA is integral to the Final Rule as a whole

The Court considered irreparable harm as a "threshold matter." ECF 95 at 8. And it correctly determined that the EFA provisions of the Final Rule cause irreparable harm to Plaintiffs. ECF 95 at 16. In effect since August 8, 2024, the EFA requires providers to conduct a comprehensive evaluation of their facility, residents, staff, and resident families to determine staffing and other needs. The Final Rule mandates LTC facilities to ensure the "active involvement" of direct care staff and their representatives, and to "solicit and consider input" from residents, their representatives, and family members. 89 Fed. Reg. at 40,908; *id*. at 40,905-06. Facilities must "review and update" the EFA at least annually, without clear guidance on when updates are "necessary"—thus, leading to potential civil penalties. *Id.* at 40,999. LTC facilities must also create "contingency planning," despite already having emergency plans in place. *Id.* at 41,000.

Overall, the EFA imposes significant administrative burdens and vague requirements that could result in fiscal penalties even with LTC facilities seeking to comply in good faith. CMS estimates the cost of the EFA to be around $4,955 per facility, but that number is too low. Plaintiff Dooley Center, for example, took approximately 16 hours of staff time to complete the enhanced facility assessment, which comes out to approximately $579.36 per month to stay in compliance. For plaintiff Wesley Towers, the enhanced facility assessment required 89 hours to complete, costing thousands of dollars of staff time and diverting their attention from other work. ECF 30-24 at 2 ¶ 5. Underscoring the arbitrary nature of the Final Rule's staffing mandates, both Dooley Center's and Wesley Towers' enhanced facility assessment

3

demonstrated there is no supported need for 24/7 RN coverage, as their acuity is relatively low, with no major diagnosis or skill needs requiring an RN on site around the clock. *See* ECF 30-25 at 2-4 ¶ 9; ECF 30-24 at 1 ¶ 4.

Accordingly, the Final Rule, through its EFA provisions, irreparably harms Plaintiffs. But instead of proceeding to analyze Plaintiffs' likelihood of success on the merits for the Final Rule as a whole, the Court considered likelihood of success only with respect to the Final Rule's EFA provision, since that was the only source of irreparable harm the Court believed warranted a preliminary injunction. The Court also did not determine that the EFA provision were severable from the Final Rule, and declined to perform any severability analysis. ECF 95 at 21, fn. 11 Absent a determination that the EFA is severable from the Final Rule's other requirements, the Final Rule should be considered as an intact whole for purpose of preliminary injunctive relief.[2] The Court's failure to do so was error—the Final Rule should have been enjoined as long as an inseverable part of it will cause irreparable harm to the Plaintiffs.

The Court did not cite any case to support its approach in splitting up the Final Rule in its preliminary injunction analysis. But Eighth Circuit precedent shows the Court should have taken a different approach. In *Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024), the Eighth Circuit enjoined the U.S.'s entire loan forgiveness rule (SAVE), despite a district court finding that only the ultimate forgiveness provision of the rule imposed irreparable harm. The Court's Order stated the *Missouri* injunction was issued "only because the Government created a hybrid rule that made the district court's injunction useless." ECF 95 at 17. But that is incorrect. If the hybrid rule caused irreparable harm by enabling continuing loan forgiveness despite the district court injunction, the Eighth Circuit could have enjoined the loan forgiveness provision of the

---

[2] Plaintiffs have maintained throughout this litigation that they are challenging the entire Final Rule. *See* Order, ECF 95 at 10, fn.5.

4

hybrid rule. Instead, it enjoined the entire rule because the entire rule facilitated the irreparable harm.

That is the case here as well. The Court's Order ignores that the EFA is a not a separate, unconnected provision of the Final Rule. It is an inseparable support to the minimum staffing requirements. The Final Rule itself acknowledges this connection between the EFA and the rest of rule repeatedly. [3] And the EFA is designed not only to ensure compliance with the minimum staffing requirements once they take effect, but to move LTCs toward compliance with those requirements. Proposed section 483.71(b)(4), for example, requires LTCs to "use their facility assessment to develop and maintain a staffing plan to maximize recruitment and retention of nursing staff." 89 Fed. Reg. at 40,906. Thus, the EFA is an essential preliminary to implementing the Final Rule's minimum staffing standard.[4] It should not have been considered separately from the other provisions of the Final Rule.

b. The Staffing Mandates irreparably harm Plaintiffs

The EFA's irreparable harm to the Plaintiff merits injunctive relief. But the EFA is not the

---

[3] *See, e.g.*, 89 Fed. Reg. at 40,881 ("we believe that national minimum staffing standards in LTC facilities and the adoption of a 24/7 RN and enhanced facility assessment requirements, will help to advance equitable, safe, and quality care sufficient to meet the nursing needs for all residents and greater consistency across facilities."); *id.* at 40,883 ("The additional requirements in this rule to bolster facility assessments are intended to address this need and guard against any attempts by LTC facilities to treat the minimum staffing standards included here as a ceiling, rather than a floor.") *id.* at 40,906 ("We proposed at new § 483.71(b)(4) that LTC facilities would have to use their facility assessment to develop and maintain a staffing plan to maximize recruitment and retention of nursing staff."); *id.* ("The facility assessment is an important complement to the minimum staffing requirements.") *id.* at 40,909 ("The facility assessment is the foundation for LTC facilities to assess their resident population and determine the direct care staffing and other resources, to provide the required care to their residents.).
[4] *See* 89 Fed. Reg. at 49,909 ("the new [EFA] requirement… is intended to provide clarification on how LTC facilities are to use their facility assessments… The facility assessment must be conducted and developed with the intent of using it to inform decision making, especially about staffing decisions. The facility assessment must be used to develop and maintain the staffing plan or the plan to maximize recruitment and retention of direct care staff… Thus, the facility assessment would inform the staffing plan the LTC facility requires.").

5

Final Rule's only source of irreparable harm to Plaintiffs. Both the State Plaintiffs and organizational Plaintiffs will suffer irreparable harm from the Final Rule's minimum staffing requirements. The Court held that compliance costs incurred to comply with a potentially invalid regulation may constitute irreparable harm. ECF 95 at 12. That holding recognizes that Plaintiffs cannot recover a remedy of money damages for harm caused by the Final Rule due to the sovereign immunity of the United States. The Final Rule's imposition on all Plaintiffs of substantial compliance costs therefore constitutes irreparable harm that only a preliminary injunction can prevent. The Court erred by determining these harms are not irreparable.

The Court recognized that the 24/7 RN requirement and HPRD requirements "will impose tremendous costs on LTC facilities." ECF 95 at 12. The court believed, however, that such costs were "too speculative" to constitute irreparable harm for purpose of a preliminary injunction. Id. Plaintiffs submitted substantial evidence showing that they are incurring costs now from the 24/7 RN and HPRD requirements of the Final Rule. In particular, multiple Plaintiffs filed declarations testifying as to the changes that many of their member LTCs already were undertaking as a result of the Final Rule. For example, LeadingAge Virginia discussed how many of their nursing homes already were "attempting to hire additional RNs rather than LPNs" because of the 24/7 RN and HPRD requirements, and were "increasing hiring efforts" more broadly in preparation for the Final Rule going into effect. ECF 30-22 at 9 ¶ 11. Similarly, LeadingAge Iowa similarly testified that their member facilities "are attempting to hire RNs over LPNs whenever possible" and engaging in expensive and aggressive recruitment strategies in preparation for the Final Rule. ECF 30-10 at 8 ¶ 9.

The Court did not dispute the fact of the imposition of these costs now, but instead noted that they Plaintiffs did not submit "cost breakdowns" as to these efforts. Such a detailed cost breakdown is not required for a preliminary injunction, and it was incorrect for the court to

6

require such specifics when the fact of substantial injury is clear.

The State Plaintiffs operate their own state-run nursing homes that are subject to the Final Rule that will incur all of these same costs and burdens. For example, Arkansas has a state-operated 310-bed psychiatric nursing home, the Arkansas Health Center, see Ark. Code Ann. § 25-10-401; Idaho has at least five state-run nursing homes subject to the Final Rule; and West Virginia operates four nursing homes that collectively has 312 beds. These nursing homes and, by extension, the State will suffer the same harms that the LTCs described above suffer, with massively increased staffing costs, an inability to hire necessary staff such that they are forced to reduce services or even close, and increased staff time and costs devoted to EFAs that contain vague directives as to the requirements and frequency.

The harms to the State Plaintiffs are even more extensive due to their additional regulatory role. Take Indiana as an example. There, the Indiana Health Coverage Program and Indiana PathWays for Aging provide coverage for long-term care services provided to eligible members with an applicable level-of-care determination. CMS estimates that complying with the 24/7 RN Requirement will cost over $10.9 million annually in Indiana. 89 Fed. Reg. at 40962, tbl. 18. Statewide, CMS estimates that complying with this rule will cost Indiana LTD facilities $151.2 million. Id. at 40984, tbl. 28. Much of this cost will be passed on to health plans, like Indiana Health Coverage Program and Indiana PathWays for Aging offered by the State.

Plaintiffs have established irreparable harm from the entirety of Final Rule if it is not preliminarily enjoined.

II.     **Defendants will not suffer any harm if the Final Rule is enjoined**

Unlike the irreparable harm that Plaintiffs will suffer absent an injunction, an injunction pending appeal cannot harm Defendants. Defendants alleged that they are harmed if their rulemaking is even briefly delayed because it would "frustrate Congress's objectives" by

7

blocking the Secretary of Health and Human Services from enacting a regulation authorized by statute. *See* U.S. Response, ECF 72 at 52. But if the Final Rule is unlawful, not authorized by statute, or arbitrary and capricious (i.e. if Plaintiffs are likely to succeed on the merits), then there is no harm to Defendants.

Second, Defendants would not be harmed because an injunction pending appeal would not delay the purported benefits of the Final Rule. This is because the Final Rule is front-loaded so that its harms to the Plaintiffs occur long before any alleged benefits. Plaintiffs have been harmed and will continue to be harmed due to the Final Rule's compliance costs in the first year. The Court agreed that the EFA requirement harmed Plaintiffs and the costs of compliance "will recur on an ongoing basis." Order, ECF 95 at 16. In addition to the EFA, Plaintiffs also incur costs as they must act now to prepare to comply with the staffing mandates. But the staffing mandates will not become effective until 2026 at the earliest, which means the benefits, if any, of increased staffing are also years away. There would be no harm in enjoining the Final Rule, therefore, as a preliminary injunction would not delay the effective date of the Final Rule's staffing mandates.

Accordingly, the balance of harms greatly favors an injunction pending appeal, as Plaintiffs bear all the costs of the Final Rule's continued application, while Defendants would not be harmed by an injunction.

### III. Plaintiffs are likely to succeed on the merits

The Final Rule is contrary to statute, violates the major questions doctrine, exceeds Defendants' statutory authority, and is arbitrary and capricious. The success of any one of these claims will result in Plaintiffs succeeding on the merits.

The Court acknowledged that Plaintiffs "raised substantial issues and concerns about Final Rule's 24/7 RN requirement and HPRD requirements." ECF 95 at 21. However, the Court

8

did not evaluate Plaintiffs' likelihood of success on those claims. This was error, since likelihood of success is the "most significant" factor for a preliminary injunction. *Missouri*, 112 F.4th at 536; *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). A full analysis of Plaintiffs' likelihood of success, along with consideration of the balance of the equities, would have pointed decisively in Plaintiffs' favor, and would have merited injunctive relief. *See Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1974) ("If the balance [of the equities] tips decidedly towards the plaintiffs *and the plaintiffs have raised questions serious enough to require litigation*, ordinarily the injunction should issue.") (emphasis added).

When the Final Rule is analyzed as a whole, it is clear that is unlawful, violates the major questions doctrine, exceeds statutory authority, and is arbitrary and capricious.

1. **The Final Rule is unlawful**

The Final Rule violates existing law. Congress already established the minimum amount of RN staffing necessary to participate in Medicaid or Medicare: LTC facilities "must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. §1396r(b)(4)(C)(i); *accord id.* § 1395i-3(b)(4)(C)(i). The Final Rule replaces that 8/7 RN requirement with a mandate that all LTC facilities "must have a registered nurse (RN) onsite 24 hours per day, for 7 days a week." 89 Fed. Reg. at 40,997. Defendants cannot rewrite a different universally applicable floor of 24/7 RN coverage into a statute that was enacted with an 8/7 RN floor.

Congress also requires 24-hour licensed nursing staff (in addition to the 8-hour RN) sufficient to meet the nursing needs of nursing home patients, 42 U.S.C. § 1396r(b)(4)(C)(i)(I). But LTCs may receive a waiver if, among other things, the LTC demonstrates that it has been unable to recruit the necessary staff, and the "State determines that a waiver of the requirement will not endanger the health or safety of individuals staying in the facility." *Id* §

9

1396r(b)(4)(C)(ii). The Final Rule also has a waiver provision, but it provides an 8-hour per day exemption to the 24-hour staffing. 89 Fed. Reg. 40,953. This means that a nursing home will never be allowed to have less than 16 hours of nursing staff per day. The statute on the other hand provides waivers *even to its 8/7* staffing requirements. *See* 42 U.S.C. § 1396r(b)(4)(C)(ii); *accord* § 1395i-3(b)(4)(C)(ii). So the Final Rule renders the statutory waiver void. The court should not accept an interpretation of the statute that makes the statute ineffective.

### 2. The Final Rule violates the major questions doctrine

When agency action involves a matter of "vast economic and political significance," the agency must find clear congressional authority approving of such action. *Alab. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. 758, 764 (2021) (finding no clear congressional authority for the CDC to issue a nationwide eviction moratorium). The requirement of clear congressional authorization is based on "both separation of powers principles and a practical understanding of legislative intent." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Courts should "'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism.'" *Id.* (quoting *Util. Air Regul. Group v. EPA*, 573 U.S. 302, 324 (2014)). The major questions doctrine is also implicated given its impact on powers reserved to the States. "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *Id.* at 744. (Gorsuch, J. concurring). CMS has "intruded" on powers traditionally reserved to the States by forcing this staffing rule on them. Because Congress required only 8/7 staffing and allowed flexibility for LTCs based on the needs of their facilities, states have moved to add further requirements based on the needs of their residents and communities.

The Final Rule therefore poses a major question. Defendants propose to revamp the entire nursing home industry to the tune of at least $43 billion dollars in compliance costs,

10

similar to what the Supreme Court has held qualifies as a rule of vast economic significance. *Ala. Ass'n of Realtors*, 594 U.S. at 764 (finding a $50 billion cost triggered the major questions doctrine). The actual cost is likely higher. The Final Rule also impacts nearly all LTCs in almost every state, and threatens to drive a large percentage of them out of business.

When a court finds a major question, it must look for "clear authorization," not some "vague statutory grant." *West Virginia*, 597 U.S. at 732. But a vague statutory grant is all Defendants offer. And even that requires ignoring the statutes more specific—and less onerous—8/7 minimum staffing requirements. Without clear congressional authorization, Defendants violate the major questions doctrine.

3. **The Final Rule exceeds Defendants' statutory authority**

But Defendants not only lack clear statutory authorization, they lack any plausible authorization at all. CMS, like all administrative agencies, is a "creature[] of statute," and accordingly "possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also* 42 U.S.C. § 1302(a) (Secretary may not "publish rules and regulations" that are "inconsistent with" the law).

In the absence of clear statutory authority, Defendants use a "miscellaneous" and "other" authority to triple the minimum staffing hours Congress has already implemented. And they use that same provision to authorize staffing ratios that are nowhere to be found in the statute. Even if CMS had some authority to set staffing requirements through vague statutory provisions, it could not use that limited authority to contradict what Congress had already put into place. "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). The Final Rule is a crude attempt by CMS to play sorcerer.

a. **24/7 RN requirement**

11

Defendants have no authority to triple the requirement for the minimum amount of RN staffing necessary to participate in Medicaid or Medicare. Congress has already decided the issue: LTC facilities "must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. § 1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i). The Final Rule replaces that statutory floor by mandating that an LTC "must have a registered nurse (RN) onsite 24 hours per day, for 7 days a week." 89 Fed. Reg. at 40997.

CMS, like all administrative agencies, can only promulgate rules "pursuant to authority Congress has delegated to [it]." *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006). But Defendants do not rely on specific delegations of authority; they rely on "various provisions" elsewhere in sections 1395i-3 and 1396r that contain "separate authority" for minimum staffing levels, *id.* at 40879, 40890-91. These provisions include:

1) A requirement that an LTC must meet "such other requirements relating to the health and safety of residents or relating to the physical facilities thereof as the Secretary may find necessary," 42 U.S.C. § 1396r(d)(4)(B), *accord* 42 U.S.C. § 1395i-3(d)(4)(B).

2) A requirement that an LTC "must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care," 42 U.S.C. § 1396r(b)(2), *accord* 42 U.S.C. § 1395i-3(b)(2); and (3)

3) A requirement that an LTC facility "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A); *accord* 42 U.S.C. § 1395i-3(b)(1)(A).

Defendants claim the authority to rewrite the specific minimum staffing statutes that

apply to LTCs by virtue of a general authority found in other, catch-all provisions of the statute. They thereby violate the principle that "[g]eneral language" in one part of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment." *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). The best reading of the statutory authority that CMS relies on is that it is related to administrative details concerning the health and safety of LTC patients which the rest of the Medicare and Medicaid statute does not already cover. It does not authorize a 24/7 RN mandate that replaces the 8/7 RN mandate.

### b. The HPRD Requirements

The Final Rule's HPRD requirements are similarly not authorized by statute. Congress carefully considered whether to enact *quantitative* staff-to-patient ratios for LTC facilities, and it chose not to do so. Congress chose a *qualitative* standard in the underlying statutes, leaving quantitative staff-to-patient ratios to the states: LTC facilities must provide nursing services "sufficient to meet the nursing needs of its residents." 42 U.S.C. § 1396r(b)(4)(C)(i); *accord* § 1395i-3(b)(4)(C)(i).

The Final Rule unlawfully substitutes CMS's current policy views for Congress' considered judgment. Instead of accommodating the wide variation of resident needs in different states and communities, the Final Rule inflexibly mandates that each facility in each state meet an arbitrary numerical staffing threshold: "[a] minimum of 3.48 hours per resident day for total nurse staffing[,] including but not limited to—(i) [a] minimum of 0.55 hours per resident day for registered nurses; and (ii) [a] minimum of 2.45 hours per resident day for nurse aides." 89 Fed. Reg. at 40996.

Just as with the 24/7 RN mandate, the HPRD requirements rely on the general, catch-all authority of provisions requiring LTC facilities to "provide services to attain or maintain the

13

highest practicable physical, mental, and psychosocial well-being of each resident," and "promote maintenance or enhancement of the quality of life of each resident." 89 Fed. Reg. at 40879, 40890-91; *see* 42 U.S.C. §§ 1395i-3(b)(1)(A), (b)(2), (d)(4)(B); 1396r(b)(1)(A), (b)(2), (d)(4)(B). None of those generalized provisions authorize CMS to impose nationwide HPRD requirements for RNs, NAs, and total nursing staff. CMS's general authority over Medicare and Medicaid does not permit it to modify "matter[s] specifically dealt with in another part of the same enactment." *RadLAX Gateway Hotel*, 566 U.S. at 646; *see also* 42 U.S.C. § 1302(a) (the Secretary may not promulgate regulations that are "inconsistent with" statutory requirements).

Congress weighed what staffing levels to require from LTC facilities, and it required that each facility maintain staffing levels "sufficient to meet the nursing needs of its residents." 42 U.S.C. §§ 1396r(b)(4)(C), 1395i-3(b)(4)(C). By negating and replacing Congress' judgment on staffing levels, Defendants exceed their authority.

### c. Constitutional Doubt

The authority Defendants claim in the Final Rule is so expansive that it likely makes the statute unconstitutional. If Congress truly gave CMS the authority to implement a regulation that costs at least $43 billion to comply with and overrides another one of its provisions, then it supplied no intelligible principle to guide how that power should be exercised. If CMS' interpretation was accepted as the one Congress intended it would present serious nondelegation concerns. *See Kentucky v. Biden*, 23 F.4th 585, 607, n.14 (6th Cir. 2022). ("If the government's interpretation were correct—that the President can do essentially whatever he wants so long as he determines it necessary to make federal contractors more 'economical and efficient'—then that *certainly* would present non-delegation concerns.").

The constitutional doubt canon requires this Court to interpret the Rule to avoid these severe constitutional problems. As the Supreme Court has explained, its "application of the

14

nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta v. United States*, 488 U.S. 361, 373, n.7 (1989). The Supreme Court thus reads statutes with this principle in mind, *see, e.g.*, *Gundy v. United States*, 139 S.Ct. 2116 (2019). This Court should do the same and reject Defendants' expansive claim of authority.

### 4. The Final Rule is arbitrary and capricious

Defendants acted arbitrarily and capriciously because they (1) engaged in a sharp departure from past practice without reasonable explanation, (2) failed to consider reliance interests, and (3) failed to consider important aspects of the problem.

The APA's arbitrary-and-capricious standard requires agency action to be "reasonable and reasonably explained." *E.g.*, *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Id.* An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or fails ignores alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The standard is also met when an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 628 (8th Cir. 2005).

And when an agency changes a longstanding policy, it must "show that there are good reasons for the new policy" and "be cognizant that longstanding policies may have 'engendered

15

serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

> a. **Sharp Departure**

Over 50 years, Defendants have not imposed any minimum staffing requirements beyond what is set by statute. See ECF 30 at 25. Then Defendants commissioned an expedited study (the Abt Study) to tell them what they wanted to hear and issued the Final Rule. And even the Abt study was inconclusive—it did "not identif[y] a minimum staffing level to ensure safe and quality care." Abt Study at 115. But it did find that "[n]ursing homes [would] face barriers to hiring, primarily [with] workforce shortages and competition from staffing agencies." *Id*. at xi. While an agency may depart from past practice, it must explain demonstrate there is good reason for doing so. *Encino Motorcars, LLC*, 579 U.S. at 221-22. Defendants gave a weak, pretextual reason, not a good one. This was arbitrary and capricious.

> b. **Failure to Consider Reliance Interests**

Since the flexible staffing mandate was implemented decades ago, states responded by setting staffing requirements tailored to their citizens' needs. *See* ECF 30 at 26. In turn, LTCs have devoted their resources to meeting the state requirements and working with local lawmakers to achieve a workable standard. CMS admits its 24/7 RN requirement imposes a one-size-fits-all requirement, 89 Fed. Reg. at 40,908. Such an approach is not only unworkable in a nation made up of such diverse states, and it also upends the deliberate Congressional policy to set a minimum standard that states might adapt to their needs.

When an agency upends decades of state laws and practices that LTCs have relied on, it must seriously consider those reliance interests. *Encino Motorcars, LLC*, 579 U.S. at 221-22. Instead, Defendants focused only on increased staffing benefits, without considering how states and LTCs had invested in alternative staffing arrangements that balanced high quality care with

16

realistically achievable staffing levels. It was arbitrary and capricious to ignore those reliance interests.

    c. **Failure to Consider Important Aspects of the Problem**

Finally, the Final Rule is arbitrary and capricious because it fails to consider both the virtual impossibility of complying with the mandates and the staggering costs it puts on LTCs. It is nearly impossible for many LTCs to comply with the Final Rule.[5] Defendants acknowledge the new requirements "exceed the existing minimum staffing requirements in nearly all States" and will require increased staffing "in more than 79 percent of nursing facilities nationwide." 89 Fed. Reg. at 40877. But they say nothing about how a nationwide staffing shortage can fixed by mandating even more staff.

Defendants estimate that LTC facilities will need to hire an additional 15,906 additional RNs to meet the 24/7 RN requirement and 0.55 RN HPRD requirement (an increase of about 11.8%), plus an additional 77,611 NAs to meet the 2.45 NA HPRD requirement and 3.48 total nurse HPRD requirement (an increase of about 17.2%). *See id.* at 40,958, 40,977-80. Those increases are unattainable at a time when many LTC facilities are already experiencing extreme difficulty finding qualified RNs and NAs to fill vacant positions, and when staffing shortages are expected only to worsen.[6] The Final Rule is a mandate that many LTC facilities will have no realistic way to meet.

Yet, faced with evidence of the staffing shortages that the Final Rule would cause, Defendants irrationally asserted that "[a] total nurse staffing standard will guard[] against" it. 89 Fed. Reg. at 40,893; *see* 88 Fed. Reg. at 61,366, 61,369. Defendants "fully expect[s] that LTC facilities will be able to meet [the Final Rule's] requirements," 89 Fed. Reg. at 40894, but the

---

[5] *See, e.g.*, ECF 30, Pezzano Decl. ¶¶ 15-30; South Decl. ¶¶ 4-8; Monger Decl. ¶¶ 10-16
[6] *See, generally*, ECF 30, Bates Decl.; Monger Decl.; Pezzano Decl.; South Decl.

17

evidence provided by plaintiffs shows this is anything but true. *See* ECF 30 at 28-32.

CMS' "hardship exemption" does not fix the problem. First, the hardship exemptions are available only to facilities that have already failed to meet the new staffing standards—and "facilities cannot request" (or receive) "a survey specifically for the purpose of granting an exemption." 89 Fed. Reg. at 40,902. So instead of being able to proactively explain why it should be entitled to an exemption, facilities that cannot meet CMS's arbitrary requirements will face a perpetual risk of being sanctioned for non-compliance. This is not a viable exemption.

Second, the Final Rule fails to reasonably consider the staggering costs to Plaintiffs. According to CMS, the Final Rule will cost over $5 billion per year to implement once fully phased in, *see* 89 Fed. Reg. at 40,949, 40,970. But other estimates place the costs as high as $7 billion per year, *see id.* at 40,950. The Final Rule does not provide any additional funding for Medicare or Medicaid, so CMS "assume[s] that LTC facilities . . . will bear the[se] costs." *Id.* at 40,949. LTC facilities are in no position to take on this huge financial burden. [7]

CMS's imposition of this massive, unfunded staffing mandate, despite the ongoing workforce crisis and economic realities, is neither "reasonable" nor "reasonably explained." This complete failure to consider the impact of at least $43 billion in regulatory costs on LTCs with almost no assistance from the federal government is arbitrary and capricious.

IV.     The public interest and the equities favor Plaintiffs

The public has no interest in an unlawful rule. To the contrary, the public has an interest in ensuring that agency rulemakings do not exceed the statutory authority granted by Congress.

---

[7] *See, e.g.*, ECF 30, Munger Decl. ¶ 12 (estimated costs for Kansas LTCs to comply with Final Rule on minimum staffing standards range between $64 million and $92.7 million in the first year, at an average annual cost of $211,905 per facility); Hinker Decl. ¶ 8 (estimating total cost of $20 million for South Dakota facilities to comply with Final Rule).

18

By exceeding the nursing home staffing ratios that Congress set, Defendants harm the public interest.

The public interest therefore favors Plaintiffs.

## CONCLUSION

Plaintiffs request the Court to enjoin the Final Rule pending an appeal of the Court's Order. Plaintiffs respectfully request the Court to provide a ruling on this motion by the end of the day on Tuesday, January 21, in order to expeditiously seek relief if the motion is denied.

Respectfully submitted, this 17th day of January, 2025,

                              KRIS W. KOBACH
                              Attorney General of Kansas

                              */s/ James R. Rodriguez*
                              James R. Rodriguez, Kan. SC No. 29172
                              *Assistant Attorney General*
                              Abhishek S. Kambli, Kan. SC No. 29788
                              *Deputy Attorney General*
                              KANSAS OFFICE OF THE
                               ATTORNEY GENERAL
                              Topeka, Kansas 66612-1597
                              Phone: (785) 368-8197
                              Email: jay.rodriguez@ag.ks.gov
                              abhishek.kambli@ag.ks.gov

                              *Counsel for Plaintiff State of Kansas*

## CERTIFICATE OF SERVICE

This is to certify that on this 17th day of January, 2025, I electronically filed the above and foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ James Rodriguez*
James Rodriguez
*Counsel for Plaintiff State of Kansas*
