IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| STATE OF KANSAS, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, et al., <br><br> *Defendants*. | Civil Action No. 1:24-cv-00110 |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A. Congress enacts statutes that specify staffing requirements for LTC facilities**

1. In 1965, Congress established the Medicare and Medicaid programs by amending the Social Security Act. *See* Pub. L. No. 89-97, 79 Stat. 286 (July 30, 1965).

2. Nursing homes that participate in Medicare must comply with the statutory requirements for "skilled nursing facilities" ("SNFs"), 42 U.S.C. § 1395i-3, while those participating in Medicaid must meet similar requirements for "nursing facilities" ("NFs"), 42 U.S.C. § 1396r.

3. The statutory requirements for both SNFs and NFs are largely parallel. These facilities are often collectively referred to as "long-term care" ("LTC") facilities, as they are herein.

4. CMS has issued consolidated regulations applicable to all SNFs and NFs (collectively referred to as "LTCs") participating in Medicare and/or Medicaid. *E.g.*, 42 C.F.R. § 483.1.

5. Both statutes require LTC facilities to utilize the services of a registered professional nurse for "at least 8 consecutive hours a day, 7 days a week," and to provide 24-hour

1

licensed nursing services that are "sufficient to meet the nursing needs of their residents." 42 U.S.C. § 1395i-3(b)(4)(C)(i) (Medicaid); 42 U.S.C. § 1396r(b)(4)(C)(i)(I)-(II) (Medicaid).

6. There are no staffing quotas within the statutes. *See, e.g.*, 42 U.S.C. § 1395i-3(b)(4)(C)(i) (Medicaid); 42 U.S.C. § 1396r(b)(4)(C)(i)(I)-(II) (Medicaid).

7. Under the Medicare statute, the Secretary is authorized to waive the requirement for LTC facilities to employ an RN for more than 40 hours per week if: (1) the facility is "located in a rural area and the supply of skilled nursing services is not sufficient to meet the needs" of local residents; (2) "the facility has one full-time [RN] who is regularly on duty at [the LTC] for 40 hours [per] week"; (3) the LTC facility has patients whose physicians have indicated that they do not require an RN or physician for 48 hours, or it has arranged for an RN or physician to provide necessary services when the full-time RN is not on duty; (4) "the Secretary provides notice of the waiver to the State long-term care ombudsman …"; and (5) the facility that is granted the waiver notifies residents and their families of the waiver. *See generally* 42 U.S.C. § 1395i-3(b)(4)(C)(ii)(I)-(V).

8. Under the Medicaid statute, a state may waive the staffing requirements for an LTC facility if: (1) the LTC facility demonstrates that, despite diligent efforts, it was unable to recruit appropriate personnel; (2) granting a waiver will not endanger the health or safety of the LTC facility's residents; (3) during times when an RN is unavailable, an RN or physician must be able to respond to calls from the LTC facility; (4) the state agency notifies the state long term care ombudsman of the waiver; and (5) the LTC facility informs its residents and family of the waiver. *See* 42 U.S.C. § 1396r(b)(4)(C)(ii)(I)-(V). Such waivers are subject to annual review by the State and the Secretary. *See* 42 U.S.C. § 1396r(b)(4)(C) ("Required nursing care").

9. If a state is found to regularly grant waivers without facilities making diligent efforts to meet staffing requirements, the Secretary "shall assume and exercise the authority of

2

the State to grant waivers." *Id.*

### B. Congress did not to impose inflexible staffing mandates

10. After Congress amended the Social Security Act to declare that all LTC facilities participating in Medicare or Medicaid provide "24-hour nurse service[s] which is sufficient" to meet patient needs, including employing at least one registered professional nurse full-time, Pub. L. No. 92-603, § 278, 86 Stat. 1329, 1424-27 (1972), it also introduced nurse-staffing waiver provisions for rural facilities under specific conditions, *see id.* § 267, 86 Stat. at 1450.

11. The Department of Health, Education and Welfare (predecessor of HHS), through its Social Security Administration ("SSA") proposed regulations in 1973 that aligned with these statutory requirements. *See* 38 Fed. Reg. 18,620 (July 12, 1973).

12. During the notice-and-comment period for the 1973 regulations, the SSA received comments urging it to deviate from Congress's flexible (qualitative) approach for a staffing requirement that all nursing homes implement a rigid (quantitative) nurse-to-patient ratio. *See* 39 Fed. Reg. 2,238, 2,239 (Jan. 17, 1974).

13. The SSA rejected such a uniform approach, citing the variability in facility needs and the potential negative impacts of arbitrary staffing quotas. *Id.*

14. SSA reasoned that "the variation from facility to facility in the composition of its nursing staff, physical layout, patient needs and the services necessary to meet those needs precludes setting [a specific ratio]." *Id.*

15. In 1980, HHS took over the administration of Medicare and Medicaid services but the standard on staffing remained the same. *See* 45 Fed. Reg. 47,368 (July 14, 1980).

16. It proposed a "general revision" of the regulation governing the participation of LTC facilities in Medicare and Medicaid. *See id.*

17. HHS declined to implement any specific staffing ratios. *Id.* at 47371; *see also id.* at

3

47387.

18. In 1987, Congress—and not HHS—redefined nursing home categories and imposed uniform staffing requirements on LTC facilities under Medicare and Medicaid by requiring a registered nurse on duty for at least eight hours per day, seven days a week. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4201(a), 101 Stat. 1330-161; *accord id.* § 4211(a), 101 Stat. 1330-186 (Dec. 22, 1987).

19. Congress included waiver provisions and commissioned studies to analyze staffing requirements—in particular "the appropriateness of establishing minimum caregiver to resident ratios." *See* Pub. L. No. 101-508, §§ 4008(h), 4801(a), 104 Stat. 1338 (1990)).

20. Congress implemented no mandatory ratios or staffing requirements, and CMS continuously administered the staffing standards established by Congress without incident. *See* 42 C.F.R. § 483.35(a)-(b) (2016).

21. In 2016, CMS once again dismissed the push for mandatory staffing ratios in LTC facilities and for the 24/7 RN requirement. *See* 81 Fed. Reg. 68,688, 68,754-56 (Oct. 4, 2016).

22. It concluded that a "one-size-fits-all approach" to staffing was not only "inappropriate[,]" but also that "mandatory ratios" and a "24/7 RN presence" were concerning. *Id.* at 68,754-56, 68,758; *see also* 80 Fed. Reg. 42,168, 42,201 (July 16, 2015) (emphasizing the importance of taking resident acuity levels into account").

23. Specifically, CMS expressed concerns about mandatory ratios and the 24/7 requirement because "LTC facilities [vary] in their structure and in their resident populations." *Id.*

24. CMS determined that the "focus" of its regulations "should be on the skill sets and specific competencies of assigned staff to provide the nursing care that a resident needs rather than a static number of staff or hours of nursing care." 80 Fed. Reg. at 42,201.

25. And "establishing a specific number of staff or hours of nursing care could result in staffing to that number rather than to the needs of the resident population." *Id.*

26. CMS also found that having a 24/7 RN requirement "could negatively impact the development of innovative care options, particular[ly] in smaller, more home-like settings," and that "geographic disparity in supply could make such a mandate particularly challenging in some rural and underserved areas." 81 Fed. Reg. at 68,755.

27. As CMS acknowledged, there is "widespread variability in existing minimum staffing standards" adopted by 38 States and the District of Columbia. 89 Fed. Reg. at 40,880.

28. CMS found that obvious when it succinctly explained its rejection of the one-size-fits-all staffing requirement: "The care needs of each of these populations are different. Facilities range in size from the very small to the very large. The capabilities of these facilities are [] different." *Id.* at 68755.

C. **CMS issues the Rule that departs from past practice**

29. In February 2022, the Biden-Harris Administration departed from decades of practice to establish a "reform" that would "establish a minimum nursing home staffing requirement." White House, FACT SHEET: Protecting Seniors by Improving Safety and Quality of Care in the Nation's Nursing Homes (Feb. 28, 2022) ("White House Fact Sheet").[1]

30. The administration directed CMS to conduct a research study to determine the level and type of staffing needed to accomplish this directive. *Id.*

1. **The Abt Study**

31. CMS contracted with a private firm, Abt Associates, to perform a "mixed-methods Nursing Home Staffing Study" as a party of CMS's goal of identifying a minimum

---

[1] The White House, *FACT SHEET: Protecting Seniors by Improving Safety and Quality of Care in the Nation's Nursing Homes* (Feb. 28, 2022), available at https://tinyurl.com/bddcshn4.

staffing requirement. Abt Associates, *Nursing Home Staffing Study: Comprehensive Report* (June 2023) ("Abt Study") at viii, available https://tinyurl.com/b2ehy528.

32. The Biden-Harris Administration's goal was to issue proposed rules establishing minimum staffing requirements by February 2023. *See* White House Fact Sheet.

33. Therefore, the Abt Study was, "conducted on a compressed timeframe" with data collected between June of 2022 through December of 2022. Abt Study at xix.

34. The study was completed and published in June 2023. *Id.* at i.

35. Consistent with the decades of prior practice, the Abt Study did "not identif[y] a minimum staffing level to ensure safe and quality care." Abt Study at 115.

36. Instead, it found that if a minimum staffing level was imposed, "[n]ursing homes [would] face barriers to hiring, primarily [with] workforce shortages and competition from staffing agencies." *Id.* at xi; *see also, e.g., id.* at xii, xiv, 19, 31-32, 115.

37. It concluded that a federal minimum staffing requirement would require between 43 and 90 percent of nursing homes to add more staff; could cost the nursing home industry up to $6.8 billion in compliance costs each year; and would increase annual total salaries per nursing home from as low as $316,000 to $693,000 in order to comply. *Id.* at 113-14.

38. In addition, there were several relevant findings that the Abt Study did <u>not</u> make:

   a. The Abt Study did <u>not</u> conclude that a minimum staffing requirement would result in *definitive* benefits. The Abt Study provides data for only "*potential* minimum staffing requirement benefits" and for "potential barriers to and unintended consequences of [an] implementation." Abt Study at 121 (emphasis added).

   b. The Abt Study did <u>not</u> conclude that a federally mandated minimum staffing requirement would *actually* provide better healthcare outcomes for nursing

6

home residents. Rather, the reviewed literature "underscored" that there was no "clear eviden[tiary] basis for setting a minimum staffing level." *Id.* at xi.

c. The Abt Study did <u>not</u> find the implementation of a federally mandated minimum staffing requirement to be feasible without considering factors such as variations in resident acuity, ongoing staffing shortages, compliance costs, and the diverse circumstances affecting quality patient care. *Id.* at 32. Rather, there was no "specific evidence" that a minimum nursing staff level could be feasibly implemented. *Id.* at 111.

39. CMS has rejected staffing mandates in the past. *See, e.g.*, 39 Fed. Reg. 2,238, 2,239 (Jan. 17, 1974) (explaining that variation in patients' needs is a valid basis to reject setting a specific staff-to-patient ratio); 45 Fed. Reg. 47,368, 47,371 (July 14, 1980) (rejecting nursing staff ratios or minimum number of nursing hours per patient day because of the lack of conclusive evidence supporting a minimum staffing requirement); 52 Fed. Reg. 38,583, 38,586 (Oct. 16, 1987) (explaining that a 24-hour nursing requirement would be impractical and that a nurse staffing requirement should be sensitive to the "patient mix") ; 80 Fed. Reg. 42,168, 42,201 (July 16, 2015) ("the focus should be on the skill sets and specific competencies of assigned staff to provide the nursing care a resident needs rather than a static number of staff or hours of nursing care that does not consider resident characteristics such as stability, intensity and acuity and staffing abilities including professional characteristics, skill sets and staff mix."); 81 Fed. Reg. 68,688, 68755 (Oct. 4, 2016) ("[w]e do not agree that we should establish minimum staffing ratios at this time . . . [t]his is a complex issue and we do not agree that a 'one-size-fits-all' approach is best . . . [o]ur approach would require that facilities take into account the number of residents in the facility, those residents' acuity and diagnosis.").

40. The Abt Study never came to a definitive conclusion that supported a national,

one-size-fits-all approach to minimum staffing requirements but also had its own shortcomings.

41. The study acknowledged but ultimately ignored several potential unintended consequences of a national minimum staffing requirement, including: (1) the possibility that nursing homes might be unable to achieve the staffing levels; (2) LTC facilities could be limited in resident admissions because of staff-to-patient ratios; and (3) nursing homes might even close down entirely, thereby potentially reducing access to care. *Id.*

2. **Promulgation of the Rule**

42. CMS issued a proposed rule in September of 2023 that introduced new minimum staffing standards for LTC facilities. *See* 88 Fed. Reg. 61352 (Sept. 6, 2023).

43. CMS received approximately 46,000 public comments—some of which warned CMS that the proposed rule exceeded CMS's statutory authority, contravened Congress's considered decision to keep flexible staffing standards, and failed to consider the barriers nursing homes would face with compliance. *See* 88 Fed. Reg. 40883.

44. CMS published the Rule in May of 2024. *See id.*

45. CMS claims that the minimum staffing standard is supported by "literature evidence, analysis of staffing data and health outcomes, discussions with residents, staff, and industry." *See* 89 Fed. Reg. at 40,877.

46. Citing the inconclusive and truncated six-month Abt Study, CMS claims that this was enough to conclude that an overly-broad staffing requirement was necessary. *See* 89 Fed. Reg. at 40,881, 40,877.

47. Yet, CMS acknowledges that "[t]here is no clear, consistent, and universal methodology for setting specific minimum staffing standards" as evidenced by the 38 states and the District of Columbia that have adopted their own nurse-to-patient ratios. *Id.* at 40881.

48. CMS asserts that "various provisions" across 42 U.S.C. §§ 1395i-3 and 1396r

8

contain "separate authority" for it to impose the Rule. *See* 89 Fed. Reg. at 40,879, 40,890-9:

- The Secretary may impose "such other requirements relating to the health and safety of residents or relating to the physical facilities thereof as the Secretary may find necessary." 42 U.S.C. § 1395i-3(d)(4)(B); *id.* § 1396r(d)(4)(B).

- An LTC facility "must provide services and activities to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident in accordance with a written plan of care." 42 U.S.C. § 1395i-3(b)(2); *id.* § 1396r(b)(2).

- An LTC facility "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1395i-3(b)(1)(A); *id.* § 1396r(b)(1)(A).

### 3. The Rule's Provisions

49. The Rule imposes two mandatory minimum-staffing requirements on LTC facilities.

50. *First*, the Rule *triples* the required hours per day of RN services. It requires LTC facilities to have an RN "onsite 24 hours per day, for 7 days a week that is available to provide direct resident care" ("24/7 requirement"). 89 Fed. Reg. at 40997.

51. Meanwhile, the Medicare and Medicaid statutes require that LTC facilities "[u]se the services of [an RN] for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. § 1395i-3(b)(4)(C)(i); *accord id.* § 1396r(b)(4)(C)(i).

52. *Second*, the Rule abandons the flexible, qualitative statutory requirement that LTC facilities "provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents." 42 U.S.C. § 1395i-3(b)(4)(C)(i); *accord id.* § 1396r(b)(4)(C)(i).

53. Instead, the Rule requires that "[t]he facility must meet or exceed a minimum of 3.48 [HPRD] for total nurse staffing," which must include a "minimum of 0.55 [HPRD] for registered nurses," and a "minimum of 2.45 [HPRD] for nurse aides." 89 Fed. Reg. at 40996.

54. Previously, federal regulations mirrored Congress's *qualitative* statutory requirements to keep nursing staff available 24-hours per day. *See* 42 C.F.R. § 483.30.

9

55. Those regulations never specified a *quantitative* staffing requirement. *Id.*; *Cf.* 89 Fed. Reg. 40,876, 40,996-97.

56. Regarding the statutory waivers, the Rule permits Medicare participants to qualify for a statutory waiver of the 24/7 RN requirement, but not the HPRD requirements. *Id.* at 40,997-98.

57. The Rule also permits Medicaid participants to qualify for the statutory waiver concerning the new 24/7 RN requirement and 0.55 RN HPRD requirement, but not for the 3.48 total nurse HPRD nor 2.45 NA HPRD requirements. *Id.* at 40,997.

58. The Rule proposes a "hardship exemption," ostensibly allowing partial relief from the 24/7 requirement and minimum HPRD requirements. *Id.* at 40,998.

59. Departing from the statutory waiver criteria, the Rules requires a facility to establish that it meets *all four* regulatory requirements to qualify: (1) proving a significant local shortage of health care staff; (2) demonstrating unsuccessful recruitment efforts despite offering competitive wages; (3) documenting financial expenditures on staffing relative to revenue; and (4) qualified facilities must publicly disclose their exemption status. *Id.* at 40,998.

60. Even *if* granted on the case-by-case determination, *see* 89 Fed. Reg. at 40886, the exemption only provides an 8-hour reprieve from the 24/7 RN requirement, leaving facilities with the requirement to staff for a minimum of 16 hours per day, 7 days per week. *Id.* at 40,998.

**Enhanced Facility Assessment ("EFA")**

61. The Rule's EFA implemented on August 8, 2024, requires providers to conduct a comprehensive evaluation of their facility, residents, staff, and resident families to determine staffing and other needs. 89 Fed. Reg. 40,881, 40,906.

62. Specifically, the Rule mandates LTC facilities to ensure the "active involvement" of direct care staff and their representatives, and to "solicit and consider input" from residents,

10

their representatives, and family members. *Id.* at 40,908. LeadingAge Kansas has requested guidance from the state survey agency contracted by CMS to carry out healthcare surveys of nursing home providers in Kansas on this provision but did not receive adequate guidance.

63. The Rule requires facilities to "review and update" the EFA at least annually, without clear guidance on when updates are "necessary"—thus, leading to potential civil penalties. *Id.* at 40,999.

64. LTC facilities must also create "contingency planning," despite already having emergency plans in place. *Id.* at 41,000. Overall, the EFA imposes administrative burdens and vague requirements that could result in fiscal penalties.

65. CMS estimates the cost at $4,955 per facility. 89 Fed. Reg. at 40,939. The Rule requires EFAs conducted on all LTC facilities without considering the acuity and needs of the residents to determine staffing levels or evaluate unique circumstances.

66. The Rule also requires states, through their Medicaid agencies, to provide "institutional payment transparency reporting" which means they must provide to CMS a yearly report on the percentage of Medicaid payments that are spent on direct compensation services versus administrative overhead costs. *See* 89 Fed. Reg. 40,995. The Rule also requires that this information be posted on state websites. 89 Fed. Reg. 40,990.

**4. CMS's Omissions from the Rule**

67. Nowhere in the Abt Study does CMS suggest that LTC facilities across the country should require an on-site RN 24 hours per day, 7 days per week.

68. CMS does not explain how it determined its 3.48, 0.55, or 2.45 HPRD requirements.

69. It claims that the 3.48, 0.55, and 2.45 HPRD levels "were developed using case-mix adjusted data sources." 89 Fed. Reg. at 40,877.

11

70. CMS claims that the 0.55 and 2.45 levels, but not the 3.48 level, were discussed during the notice of proposed rulemaking. *See* 88 Fed. Reg. 61,352 (Sept. 6, 2023); 89 Fed. Reg. at 40,891.

71. In the notice of proposed rulemaking, CMS indicated that based on findings from the Abt Study, additional data sources, "two listening sessions," and literature reviews, they proposed minimum staffing levels of 0.55 HPRD for RNs and 2.45 HPRD for NAs. 88 Fed. Reg. at 61369.

72. However, the Abt Study does not substantiate these specific levels.

73. CMS provides no rationale for the 3.48 HPRD requirement in either the notice of proposed rulemaking or the Rule, aside from vaguely stating it was developed using "case-mix adjusted data sources." 89 Fed. Reg. at 40,877.

74. CMS's minimum staffing ratios require LTC facilities to ignore the variability in resident acuity and needs across different facilities.

75. CMS fails to explain why requiring facilities with lower acuity residents to maintain higher staffing than needed is necessary for increasing quality of care.

76. CMS fails to account for the ongoing shortage of nursing staff across the country and only offers $75 million to help "increase the [LTC] workforce" that it "expects" will be used for "tuition reimbursement." 89 Fed. Reg. 40,885-86.

77. $75 million is a miniscule fraction of what is *needed* to comply or alleviate many of the affected LTC facilities, and it fails to address the foundational problem.

78. Therefore, LTC facilities will ultimately be on the hook for the remaining $43 billion compliance cost of the Rule without assistance from the federal government.

79. According to the Rule itself, the costs are projected to exceed $5 billion per year after the rule is fully implemented. 89 Fed. Red. at 40,970, tbl. 22; *see id.* at 40,949.

80. Outside studies have placed the cost of even reaching more than $7 billion per year. *Id.* at 40,950.